## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION


The Cincinnati Insurance Company,

        Plaintiff,

-v-                              **Case No.:  2:08-cv-1061**
                                         **JUDGE SMITH**
                                         **Magistrate Judge Kemp**

Savarino Construction Corporation, *et al.*,

        Defendants.


### OPINION AND ORDER

This matter is before the Court on Plaintiff The Cincinnati Insurance Company's Motion for Partial Summary Judgment (Doc. 70), and Defendants Savarino Construction Corporation and Anne and Samuel Savarino's Motion for Summary Judgment (Doc. 74).  Responses and replies have been filed.  This matter is now ripe for review.  The claims in this action arise from the construction of a tensile roof structure system at the Phoenix Center Amphitheater in Pontiac, Michigan.  Defendant Savarino Construction was the roofing subcontractor on the project pursuant to a roofing subcontract with the general contractor, Colasanti Corporation.  Plaintiff Cincinnati Insurance Company furnished the performance bond in connection with the project.  Upon Defendant Savarino's alleged default under the roof subcontract, Colasanti paid Plaintiff and then made a claim against Savarino's performance bond, thereby triggering this action.  For the reasons that follow, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment and **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment.

As a preliminary matter, Defendants have filed a Motion for Leave to file a Surreply to Plaintiff's Motion for Partial Summary Judgment (Doc. 86). Plaintiff has filed a Response in Opposition to the Motion. While the Court believes that this case has been fully briefed, in detail, Defendants have submitted the surreply to address new issues and supplemental affidavits submitted by Plaintiff in support of its Reply brief. The Court will therefore grant Defendants' Motion and consider the Surreply to the extent it addresses newly raised issues in Plaintiff's Reply brief.

## I.  BACKGROUND

Plaintiff, The Cincinnati Insurance Company ("Plaintiff" or "CIC"), is an Ohio corporation organized under the laws of the State of Ohio, with its principal place of business located in Cincinnati, Ohio. Defendant, Savarino Construction Corporation ("Savarino") is a New York Corporation with its principal offices located in Buffalo, New York. Defendants Samuel Savarino and Anne Savarino are citizens of New York and reside in Buffalo, New York.

In January 2002, the Tax Increment Financing Authority of Pontiac, Michigan ("Pontiac") embarked on an $11 million amphitheater and place renovation project on the Phoenix Center Amphitheater in downtown Pontiac, Michigan ("Project"). Work on the Project proceeded pursuant to a design/build agreement ("Design Build Agreement") between Pontiac and its design-builder, Colasanti Corporation ("Colasanti"). Defendant Savarino was the ultimate roofing subcontractor under a roofing subcontract ("Roof Subcontract") with Colasanti. Plaintiff CIC furnished a performance bond on Savarino's behalf in connection with the Project (the "Performance Bond").

Pursuant to the terms of the Design Build Agreement dated December 16, 2003, Colasanti

agreed to provide certain improvements in connection with this Project, including a 38,000 square

foot roof over the amphitheater constructed of steel columns/masts covered with a special

Teflon-coated fiberglass fabric. Under the Design Build Agreement, the term "Work" was

defined to mean both the design and construction required by the Contract Documents. Thus,

instead of the typical separation of responsibilities into multiple contracts between architect and

contractor, the Design Build Agreement as a design-build contract integrated the design and

construction functions and placed responsibility for both with one entity, i.e., Colasanti.

To protect the Project against loss or damage during the design and construction phases

of the Project and prior to final payment, the Design Build Agreement required Colasanti to

procure a Project Professional Liability Insurance policy to protect against errors and omissions

by any design professional associated with the Project. Thus, Paragraph 12.4.5 of the Design

Build Agreement specifically required Colasanti to obtain the following coverage:

> PROJECT PROFESSIONAL LIABILITY INSURANCE: aggregate coverage of
> $3,000,000. This coverage shall include prior acts coverage sufficient to cover all
> professional services rendered to the Project by Contractor's design employees,
> the architect and other design subconsultants. The coverage shall be continued in
> effect for four years after the Date of Substantial Completion.

Despite the aforementioned clause, there is no evidence that Colasanti ever obtained such a

policy.

With respect to damages that may occur during construction, Colasanti was required to

provide a project specific Builder's Risk Insurance policy for the Project in effect through final

payment by Pontiac. That obligation is set forth in Paragraph 12.8 of the Design Build

Agreement which specifically provides:

> [Builder's Risk insurance shall be maintained] unless otherwise provided in the

Contract Documents or otherwise agreed in writing by all persons or entities who
are beneficiaries of such insurance, until final payment has been made as provided
in Paragraph 8.2 or until no persons or entity other than TIFA has an insurable
interest in the property required by this Paragraph 12.8 to be covered, whichever is
earlier. This insurance shall include the interests of TIFA, the Contractor,
Subcontractors, and Sub-subcontractors in the Project.

The builder's risk insurance coverage was intended to protect parties such as Pontiac,
Colasanti, Savarino and their respective subcontractors against accidental loss or damage to
property that results from, among other things, fire, lightning, wind, snow, vandalism and riots,
that might occur before final payment. (*See* Hennigan Dep. at 142-143; Kosnik Dep. at 57, 82-83
("the purpose of a builder's risk policy and this policy in particular is to cover accidental damage
such as that suffered by the partially suspended roof")). Colasanti did initially purchase a project
specific builder's risk policy with Great American Insurance Company of New York ("GAIC"),
with an effective policy period from November 1, 2003, through November 1, 2004. Following
the initial coverage period, Colasanti renewed the policy on a month to month basis only until
June 4, 2005, at which time the policy lapsed.

The Project architect for Colasanti was TMP Architects who was to perform all of the
architectural/design services for the Project pursuant to a Design Subcontract with Colasanti.
With respect to the tensile roof, Colasanti initially approached Birdair, Inc., a specialty contractor
experienced in tensile fabric membrane roofs. Birdair prepared a significant portion of the design
and attendant documents in anticipation of being awarded a design/build subcontract for the roof,
but then failed to obtain the necessary bonding. (*See* Savarino Aff. at ¶6). Therefore, Colasanti
provided Graboplan, Inc., another specialty roofing contractor, with the Birdair design to price
and build Birdair's design, and a letter of intent was executed for Graboplan to commence work

-4-

with a formal subcontract agreement intended to follow. (*Id*. at ¶7). Graboplan then subcontracted with FTL Design Studio Services, Inc. on April 15, 2004, to finalize the Birdair design and to confirm the structural engineering analysis of that design. Thus, FTL expressly based its fee and scope of work using the existing design, as is, without modification. By June 17, 2004, FTL had completed about 80% of its design services.

However, Graboplan also failed to obtain payment and performance bonding. Therefore, Graboplan approached Savarino to enter into an agreement for Graboplan to provide substantially all of the required work, and Savarino to furnish the required payment and performance bonds. (Savarino Aff. at ¶9). Savarino was being asked to pledge its bonding for the Project to construct a tensile roof that had already been designed by others over which it had no control contractually, or otherwise, and to ensure the completion of the work by a subcontractor who would assume almost exclusive responsibility for the work. (*Id*. at ¶ 11). Therefore, Savarino relied on the fact that Colasanti was required to procure and maintain Project Professional Liability Insurance and project specific Builder's Risk Insurance covering the inherited roof design, and incorporated these broad insurance obligations into the Roof Subcontract. (*Id*. at ¶10).

On March 28, 2003, Savarino, as Contractor and Corporate Indemnitor, and Samuel and Anne Savarino, as Indemnitors, entered into an Agreement of Indemnity ("Indemnity Agreement") with Plaintiff CIC. Plaintiff issued the Performance Bond for the Project on July 1, 2004, and Savarino signed the Roof Subcontract with Colasanti on July 15, 2004, with an effective back-date of March 22, 2004. Savarino then subcontracted the responsibility for furnishing and erecting the tensile roof structure system under the Roof Subcontract to Graboplan, pursuant to a subcontract dated August 26, 2004.

Construction of the tensile roof began in October 2004 and by February 2005, Graboplan began installing the membrane fabric, but unexpected snow and wind interrupted the installation and caused damage, leaving pinholes in the fabric covering.  Savarino worked with Colasanti for a solution with the expectation that the cost of the repairs would be paid for with Colasanti's builders risk policy insurance proceeds.

Colasanti made a demand upon its builder's risk insurer for the Project, GAIC, to recover funds to correct the pinhole defects. GAIC denied the claim, filed an action for declaratory relief, and Colasanti counterclaimed against GAIC seeking money damages.  In the GAIC litigation, Colasanti argued that the pinholes were caused by the inclement weather experienced in February 2005, and that the installation of the tensile roof had been performed pursuant to industry custom and practice.  (*See* Kosnik Dep. at 81-84).  Notwithstanding its pursuit of a remedy under the builder's risk policy, Colasanti also gave notice to CIC of a potential claim under the Performance Bond.

In October 2007, Colasanti and GAIC settled the pinhole defect litigation for the sum of $337,500.  Savarino was not a party to the litigation or the settlement agreement.  Savarino asserts that the settlement amount should have been used to pay for the repairs.  However, Colasanti did not pay Savarino any of the proceeds and instead used the proceeds to "close-out" its contracts with non-roof related subcontractors to prevent them from making claims against Colasanti's own payment bond.  (Savarino Aff. at ¶20; Kosnik Dep. at 110-113).  Meanwhile, on November 5, 2005, a windstorm hit the Project causing tears to the fabric roof.  Without admitting fault or liability, Savarino attempted to make the necessary repairs.  (Savarino Aff. at ¶17).  Hennigan admitted that Savarino had not stopped working on the Project and

acknowledged that it was on site working to fix the tears.  (*See* Hennigan Dep. at 73).  Following a series of additional adverse weather events resulting in additional cone tears, the roof completely failed while Savarino was implementing temporary repairs and the roof had to be dismantled.  The severe wind event that caused this irreparable damage occurred on January 30, 2008, when winds in excess of 50 mph hit the roof which was layered with the weight of ice from an earlier ice storm.  (Savarino Aff. at ¶17).

In February 2008, Savarino, together with its design professional Architen Landrell, met with Colasanti and the City of Pontiac TIFA Board.  Savarino proposed a new design for the tensile roof and was told that any remedial work must be completed by the end of May 2008.  In early March 2008, Savarino advised that the fabric had been ordered and that Savarino "is proceeding with all due haste to undertake the replacement of the tensile roof in time for various events that are scheduled beginning May 24, 2008."  (Ex. C to Plaintiff's Mot. for Summ. J.).  On April 18, 2008, Colasanti meet with Savarino and CIC as required by the Performance Bond and discussed the delay in completion of the roof and the new deadline for completion was August 8, 2008.

In mid-May, counsel for the Pontiac TIFA Board wrote counsel for Colasanti expressing frustration at the lack of progress by Savarino and demanding that he immediately be provided with (1) executed contracts for the completion of the tensile roof by August 8, 2008; (2) receipts for the purchase of fabric to be utilized in construction; and (3) payment of $102,000.00 to cover the cost of staging events scheduled for the amphitheater at alternate venue(s).  The demands of the Pontiac TIFA Board were forwarded to Savarino and CIC.  When Savarino failed to satisfy TIFA's demands, a Declaration of Default was issued by Colasanti on June 6, 2008.  (*See* Ex. H

to Pl.'s Mot. for Summ. J.).  Colasanti sent a Second Notice of Default on June 13, 2008.  (*See* Ex. I to Pl.'s Mot. for Summ. J.).  On June 20, 2008, Colasanti sent a Notice of Termination to Savarino and made a demand on CIC under the Performance Bond.  (*See* Exs. J and H to Pl.'s Mot. for Summ. J.; Savarino Aff. at ¶¶ 20-21; Kosnik Dep. at 113).

CIC acknowledged receipt of Colasanti's termination letter and claim, participated in a meeting with Colasanti on June 23, 2008, and immediately worked out an action plan that same day to solicit bids from other contractors to complete the work under the Roof Subcontract. (Hennigan Dep. at 129-132).  From July through October 2008, Colasanti prepared a Request for Quote for redesign and replacement of the tensile roof and solicited bids to perform the work. After the bids were received, Colasanti and CIC representatives interviewed the bidders to determine whether their bids were complete and responsive.  Only one entity, Span Systems, provided a responsive bid and was willing to undertake the work.

On approximately December 23, 2008, Colasanti and CIC executed a Tender Agreement pursuant to which CIC tendered Span Systems to Colasanti as the Completing Contractor as partial satisfaction of its obligation under the Performance Bond. Thereafter, Span Systems entered into a contract with Colasanti for the redesign and installation of the tensile roof.  The work was performed from March 2009 through July 2009.  CIC reimbursed Colasanti for the cost of the work performed by Span Systems and other obligations of Savarino under the provisions of the Colasanti/Savarino contract.  As of July 8, 2010, as a result of executing the Pontiac Bonds in favor of Colasanti on the Pontiac project, CIC incurred loss payments in the amount of $1,776,715.31 and expenses, including costs and attorney fees associated with its response to the claim on the Performance Bond and the prosecution of this action in the amount of $230,598.24.

On October 2, 2008, CIC notified the Indemnitors, the Savarinos, that it had incurred losses and expenses and further demanded reimbursement for those amounts paid to date, and collateral equal to CIC's reserve for pending claims on the Bonds.  Specifically, CIC demanded that the Indemnitors immediately reimburse CIC $140,516.03 for losses and expenses it incurred to date and to immediately deposit with CIC the sum of $2,393,940.38 as collateral security to support the reserves CIC had established.  (*See* Ex. N to Pl.'s Mot. for Summ. J.).  The Indemnitors did not do as requested because they believed that there was no default.

In response to CIC's letter, counsel for Savarino on both October 9, and October 28, 2008, explained why Savarino was not in default of its Roof Subcontract obligations to Colasanti and offered to fully defend CIC against any claim that Colasanti might bring against it.  In the October 9th letter, Mr. Greenan wrote: "Savarino is not in default of its contract with [Colasanti] and would fully defend any claim brought against it or the indemderers."  (Ex. H attached to Pl.'s Memo. in Opp.).  Again on October 28th, Mr. Greenan wrote: "Colasanti does not have a valid claim against Savarino for breach of contract or failure to perform.  Savarino remains willing to defend any claim brought by Colasanti."  Mr. Greenan continued: Savarino requested a Bond from CIC to insure its performance in installing the Tensile Roof, not to insure the Architect's design or to insure against bad weather.  CIC's demand for collateral security is not reasonable nor is it based on any reasonable belief of ultimate responsibility."  (Ex. I attached to Pl.'s Memo. in Opp.).  There was no response, but Mr. Hennigan in his deposition attempted to explain by stating, "ultimately, we decided to perform because we reasonably believed that was our duty.  And we proceeded to work with Colasanti to get this project up and provide this – the City of Pontiac what they originally contracted for [.]".  (Hennigan Dep. at 112-113).

Plaintiff CIC initiated this action on November 10, 2008, against Defendants Savarino and Sam and Anne Savarino, alleging it is entitled to contractual and common law indemnification, as well as contractual and common law collateral security. Plaintiff's Complaint seeks damages from Savarino in excess of $2.39 million for reimbursement for losses and/or expenses incurred and collateral equal to the amount CIC reserved for losses and anticipated expenses, inclusive of attorney fees.[1] The primary basis of Plaintiff's damages claim result from and/or relate to Colasanti's demand that Plaintiff CIC pay the costs of replacing the tensile roof.

The Defendants have asserted multiple affirmative defenses, alleging that CIC breached its obligations under the Indemnity Agreement; CIC's demand for collateral security is unnecessary and excessive; and, CIC's request for collateral was made in "bad faith" because Savarino allegedly is not in default of any of its contractual obligations under the bonded contracts. Plaintiff CIC has moved for summary judgment on Counts I (indemnification) and III (collateral security) of its Complaint, seeking judgment in the amount of $898,019.54 and an order requiring Defendants to place cash collateral with Plaintiff in the amount of $1,740,670.83. Defendants have moved for summary judgment on all of Plaintiff's claims, contractual indemnity, common law indemnification, contractual collateral security, and common law quia timet.

## II.  STANDARD OF REVIEW

The standard governing summary judgment is set forth in Rule 56(c) of the Federal Rules

---

[1] As of July 8, 2010, CIC has paid $1,753,715.31 to Colasanti under the Tender Agreement, which is included in Plaintiff's total loss of $2,016,715.31. In addition, CIC asserts it has paid costs, expenses and attorney fees totaling $345,323.50. As a result of CIC executing bonds for Savarino, the total losses, costs, expenses and attorney fees paid as of July 8, 2010 is $2,362,038.81. In addition, CIC maintains unspent loss and expense reserves in the amount of $162,082.57.

of Civil Procedure, which provides:

> The judgment sought shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587.  The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53.  Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  *Lashlee v. Sumner*,  570 F.2d 107, 111 (6th Cir. 1978).  The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340

F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (*quoting Liberty Lobby*, 477 U.S. at 257). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### III.  DISCUSSION

Plaintiff asserts claims of contractual indemnity, common law indemnification, contractual collateral security, and common law quia timet.  Defendants have raised affirmative defenses to these claims.  The parties have submitted cross-motions for summary judgment.  The Court will consider Plaintiff's claims in turn.

### A.  Contractual Indemnity

Plaintiff CIC seeks to enforce its express rights under the Indemnity Agreement and recover its losses, costs, expenses and attorneys fees set forth above.  There is no dispute that Plaintiff CIC and the Indemnitors, the Savarinos, entered into an Indemnity Agreement on March 28, 2003.  The Indemnity Agreement provides in pertinent part:

> **SECOND:** The Undersigned shall exonerate, indemnify and keep indemnified the Surety from and against any and all liability for losses and expenses of whatsoever kind or nature, including the fees and disbursement of counsel, and against any and all said losses and expense which the Surety may sustain or incur:  (i) by reason of having executed or procured the execution of any Bond or Bonds; (ii) by reason of the failure of the Undersigned to perform or comply with the covenants and conditions of this Agreement; or (iii) in enforcing any of the covenants and conditions of this Agreement. The Surety may pay or compromise any claim, demand, suit, judgment or expense arising out of such Bond or Bonds and any such payment or compromise shall be binding upon the Undersigned and included as a liability, loss or expense covered by this Indemnity Agreement, provided the same was made by the Surety in the reasonable belief that it was liable for the amount disbursed, or that such payment or compromise was reasonable under all of the circumstances. In the event of any such payment or compromise by the Surety, an itemized statement thereof sworn to by any representative of the Surety familiar with the facts, or the voucher or vouchers or other evidence of such payment or compromise shall be prima facia evidence of the facts and the amount of the liability of the Undersigned under this Agreement. . .

(Ex. A to Pl.'s Mot. for Summ. J.).

Plaintiff CIC asserts that the language in the aforementioned Indemnity Agreement is clear

and unambiguous and requires Defendants to reimburse CIC for all losses, costs, expenses and attorneys fees.  Plaintiff has submitted the affidavits of its employees, J. Michael Hennigan and Michael M. Fox, as evidence that CIC incurred the losses sought and as *prima facie* evidence that such amounts are owed.  The affidavits confirm that CIC has spent $1,753,715.31 in resolving Colasanti's performance bond claim, as well as $227,402.84 in expenses and attorneys fees as of July 8, 2010.  Defendants, however, question whether Plaintiff CIC, or any of its agents, has performed any investigation to support its "reasonable beliefs."  (Defs.' Memo. in Opp. at 16).

The right of indemnification may arise from an express contract.  *See Cleveland Window Glass & Door Co. v. National Surety Co.*, 118 Ohio St. 414 (1928).  An indemnification contract involves the promise of the indemnitors (in this case, the Savarinos) to compensate the indemnitee (CIC) for the indemnitee's losses suffered on the indemnitors' behalf.  The ordinary rules of contract construction apply to indemnity contracts.  When enforcing an indemnity contract, the court must determine the intent of the parties from the language of the indemnity contract.  *Worth v. Aetna Casualty & Surety Co.*, 32 Ohio St.3d 238, 240-241 (1987); *see also Cleveland Window*, 118 Ohio St. at 418 ("A bond of indemnity should receive a reasonable construction in order to carry out the intention of the parties as expressed by the language used.").

The Court recognizes the *prima facie* clause contained in the Indemnity Agreement and Plaintiff CIC has submitted such *prima facie* evidence of its losses in the form of affidavits.  However, *prima facie* evidence is not conclusive evidence of the propriety of the surety's actions.  *See Transamerica Insurance Co. v. Bloomfield*, 401 F.2d 357, 363 (6th Cir. 1968) (the distinction between "*prima facie*" evidence and "conclusive" evidence was recognized).  The "*prima facie* evidence clause" shifts the burden of proof to the Defendants to show that any payment by the

-14-

Plaintiff was not made in good faith.  *Safeco Ins. Co. of Am. v. Oakland Excavating Co.*, 2009 U.S. Dist. LEXIS 50324 (E.D. Mich. 2009); *see also Ohio Farmer Ins. Co. v. Marcelli Const. Co.*, 2001 Mich. App. LEXIS 2338 (Mich. Ct. App. Nov. 9, 2001).  Summary judgment is appropriate only when the indemnitor fails to produce evidence to rebut the Plaintiff's *prima facie* claim. *Id.*

Here, the Defendants argue that Plaintiff could not have made payments to Colasanti with a good faith belief that it was liable for such amounts based on the following arguments: (1) Colasanti's default of the Roof Subcontract exonerates both the principal and the surety from liability under the bond; (2) the Indemnity Agreement imposes an express reasonableness standard on surety; and (3) that surety failed to conduct a reasonable investigation as to whether Colasanti was already in default of the Roof Subcontract.

Defendants have offered the testimony of Plaintiff's own point person for the Pontiac Project, Mike Hennigan, which they assert contradicts the self-serving affidavit statements upon which Plaintiff relies on as *prima facie* evidence of its alleged good faith.  Mr. Hennigan testified at his deposition that "[Colasanti] called upon the bond to perform, and we had to do our due diligence and make a decision on what we were going to do under the bond.  And as you know, ultimately, we decided to perform because we reasonably believed that was our duty."  (Hennigan Dep. at 112).  However, he also made some statements that could be interpreted as contradictory.

Mr. Hennigan acknowledged, and the caselaw supports, that if the owner, Colasanti in this case, is in default, then CIC's duty under the performance bond is not triggered.  (Hennigan Dep. at 113-114).  "It is a fundamental principle of law that an owner's material breach of contract

relieves the contractor of its obligations to perform and precludes a termination by the owner for default." *See* Philip L. Bruner and Tracey L. Haley, Editors, Managing and Litigating the Complex Surety Case, Tort Trial and Insurance Practice Section of the American Bar Association (2007) (hereinafter "Complex Surety Case") at pp. 29-30. Defendants assert that the same principles apply in the contractor/subcontractor context. "The surety therefore must analyze the terms of a bonded contract and the facts surrounding the contract to determine whether the owner and contractor each have performed their respective material obligations. If the obligee is found to have materially breached the bonded contract prior to any breach by the principal, . . . the obligee's termination of the bonded contract is itself a material breach that may exonerate both the principal and the surety from liability, . . .." *See* Complex Surety Case at p. 20, citing *Carter v. Krueger*, 916 S.W. 2d 932 (Tenn. Ct. App. 1995) ("[a] party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract.").

Consistent with the foregoing, Defendants argue that Plaintiff CIC was "required to confirm that Colasanti was not already in default of its obligations to Savarino under the Roof Subcontract upon Colasanti giving notice of a claim in order to meet its obligations to Savarino under the Performance Bond." (Defs.'s Memo. in Opp. at 19). Plaintiff CIC argues, however, that it did act reasonable in determining liability under the bond. CIC asserts that it had been reviewing this matter for many months prior to the settlement with Colasanti, that it retained an outside expert to analyze the subcontract between Savarino and Colasanti, and compare the Savarino obligations to the obligations Span Systems was undertaking as a replacement contractor. The expert advised that Savarino had design responsibilities under the subcontract.

-16-

(Hennigan Supp. Aff. ¶¶ 25(e) and 26(f)).  Plaintiff CIC argues that Defendants were in no way entitled to dictate the scope and timing of CIC's investigation.  CIC asserts that it satisfied itself that Defendants' asserted defenses to the Performance Bond claim were invalid and therefore, the investigation was sufficient and reasonable.  Accordingly, Plaintiff CIC argues that Defendants have not met their burden to show that CIC did not have a reasonable belief that there was liability.  However, a mere cursory review of this case illustrates that it is not a simple indemnification case as Plaintiff would like the Court to find.  The Court must therefore determine what requirements Plaintiff CIC had under the Indemnity Agreement, and if CIC was obligated to make such determination, to evaluate, what if any, investigation they did.

**1.**     **CIC's Obligation under the Indemnity Agreement**

As discussed above, the Indemnity Agreement provides that the Surety may pay "in the ***reasonable belief*** that it was liable for the amount disbursed, or that such payment or compromise was reasonable under all of the circumstances." (Emphasis added).  Mr. Hennigan described Surety's obligation to investigate a claim in accordance with the Indemnity Agreement as follows: "We are obligated to look at the position of the parties and see what happened, see what the contract says, and a make a determination whether we believe the defenses of the principal have merit, or that we have reasonable belief that we should proceed and pay the claim."  (Hennigan Dep. at 135).  Accordingly, CIC and its agents, understood that they were under an express duty to act with a "reasonable belief" and to act "reasonably under all circumstances."

Courts have refused to enforce a surety's claim for indemnification where the surety failed to exercise reasonableness in investigating and settling the claims against the principal.  *See Hartford Fire Insurance Co. v. Edgewater Construction Co.,* 21 A.D. 3d 1312 (2005) (surety did

-17-

not meet burden of establishing that payments were reasonable under indemnity agreement); *The Hartford v. Tanner*, 22 Kan. App. 2d 64, 74 (1996) (surety owes duty to reasonably investigate claims against principal's bonds); *St. Paul Fire & Marine Ins. v. Pepsico, Inc.*, 160 F.R.D. 464 (S.D.N.Y. 1995) (surety "blindly paid on bonds without investigating or defending claims and, therefore, did not act reasonably and in good faith"); *City of Portland v. George D. Ward & Associates*, Inc., 89 Or. App. 452 (1988).

In *City of Portland*, the Court held that the surety was bound by its implied covenant of good faith to exercise its discretion in compromising the claim, where surety agreement expressly stated "Surety shall have the right in its sole discretion to determine whether any claim shall be paid, compromised, defended, prosecuted or appealed." The ultimate holding in the *City of Portland* case involved a jury instruction issue; however, its analysis and findings are applicable here:

> Parties to an indemnity agreement which subjects the right to compromise a claim against the principal to the sole discretion of the surety must reasonably expect that compromise and payment will be made only after reasonable investigation of the claims, counterclaims and defenses asserted in the underlying action. In order to prove lack of good faith in settling the claim, Management and the Wards needed only to prove that Amwest failed to make a reasonable investigation of the validity of the claims against them or to consider reasonably the viability of their counterclaims and defenses, not that Amwest acted for dishonest purposes or improper motives.

89 Or. App. at 457-458. The *City of Portland* Court held that there was sufficient evidence to support the jury's determination that the surety did not conduct a reasonable investigation, including a letter written by the principal setting forth why it was not in breach, the failure to investigate whether the principal was in violation of a DEQ permit, and testimony from Amwest's counsel that he had not made an independent calculation of the obligee's damages. *Id.* Thus, in

-18-

accordance with the aforementioned law, as well as Ohio law, where the unambiguous terms of a general indemnity agreement are to be enforced as written, the reasonableness of Plaintiff CIC's actions must be considered.

        2.    **Reasonableness of CIC's Actions**

Defendants argue that CIC did not act reasonably because it never investigated, never inquired and never addressed Colasanti's potential defaults of the Roof Subcontract before it recognized the claim. Defendants argue that Mr. Hennigan fails to explain what investigation was performed by CIC. Plaintiff counters that Defendants could have asked, but didn't. Some testimony from Hennigan's deposition touches on this issue. When asked if "Cincinnati requested documents or other information from Colasanti in support of its claim on this performance bond," Mr. Hennigan responded, "I don't know that we did, and I don't know that we would have had to at this point in time. Phil had been – been keeping in touch with John Clappison regularly, since early April of '08, when all this situation – this matter was coming to a head. And we were . . . aware of what was going on and – at this point in time – at this time to gather pricing information." (Hennigan Dep. at 132-133). However, as Plaintiff correctly points out, the questions asked at the deposition do not directly address the investigation, or lack thereof by CIC.

Regardless of the deposition testimony, Plaintiff has submitted numerous affidavits in support of its' Motion which it could have used to rebut Defendants' allegations, yet Plaintiff has not disputed that it did not conduct any investigation into whether Defendants were liable under the bond. The only argument Plaintiff makes is that "CIC had been monitoring the issues relating to the project for years prior to the default and termination." (Pl.'s Memo. in Opp. at 15,

-19-

Hennigan Aff. ¶ 3).  Further, Plaintiff asserts that it did not conclude it was liable on the Performance Bond "until more than six months after the June 20, 2008 termination of the subcontract by Colasanti when the Tender Agreement was executed by CIC and Colasanti on December 23, 2008."  (Pl.'s Memo. in Opp. at 15; Hennigan Aff. ¶ 6).

There is additional evidence that Defendants argue support their arguments.  Plaintiff CIC does not dispute that upon receipt of Colasanti's June 20th termination letter and claim, CIC participated in a meeting with Colasanti on June 23rd, and immediately worked out an action plan that same day to solicit bids from other contractors to complete the work under the Roof Subcontract.  In the correspondence referenced by both parties, at no point does anyone from CIC mention any investigation of Savarino's liability.  Rather, CIC's counsel, Mr. Alber, wrote a letter to his client on July 3rd, reporting on a meeting with Colasanti to "discuss going forward." He concluded by stating "Cincinnati's objective is to determine how to complete the project to the satisfaction of Colasanti/Pontiac." In a later letter dated July 18, 2008, Mr. Alber stated that Colasanti's claim was proper because Savarino was responsible for the design of the tensile roof. At no time during any of this correspondence does CIC reference any investigation regarding Colasanti's obligations under the Roof Subcontract.  Defendants argue that Plaintiff's suggestion that it conducted a six month investigation is disingenuous.  The December 23, 2008, date was merely when the Tender Agreement was signed, but it appears that CIC had made the decision that it was liable under the Performance Bond a mere three days after the termination of Savarino. Further, it appears Plaintiff was very eager to please Colasanti, but should have been more concerned with its obligations to the Savarinos under the Indemnity Agreement. *See Swiss Reinsurance American Corp. v. Airport Industrial Park, Inc., et al.*, 325 Fed. Appx. 59 (3rd Cir.

2009) (citing Restatement (Second) of Contracts § 309(4)) ("The rights of an alleged third party beneficiary may [rise] no higher than the rights of the parties to the contract … .").

In addition to the timing issue and the lack of evidence regarding any investigation conducted by Plaintiff CIC, Defendants argue that Plaintiff CIC failed to investigate its liability under the Performance Bond because if it had, it would have discovered Colasanti's breach of the Roof Subcontract. Defendants assert that Colasanti failed to meet its contractual obligations under the Roof Subcontract on two occasions: (1) Colasanti's settlement with GAIC; and (2) Colasanti's failure to maintain the necessary insurance policies. The Court will therefore analyze each of the alleged defaults by Colasanti to determine if such claims are plausible, and if so, whether a reasonable investigation by Plaintiff would have discovered them.

### 3. Settlement with GAIC

The GAIC and Colasanti litigation over the pinholes in the roof was settled in October 2007, with a payment by GAIC of $337,500 to Colasanti. Pursuant to Paragraph 12.8.10 of the Design Build Agreement, insurance settlement proceeds were to be paid to Pontiac as fiduciary for the insureds and the Contractor was to pay "Subcontractors their just shares of insurance proceeds received by the Contractor. . .". The City of Pontiac agreed that it should not be included as a payee, but rather the check should be used to pay subcontractors and vendors on the Project. (*See* Johnson letter dated October 3, 2007, attached as Ex. C to Pl.'s Memo. in Opp.). Defendants assert that they did not receive any of the insurance proceeds from the GAIC litigation, yet were expected to pay 100% of the cost of all the roof repairs. (Savarino Aff. ¶¶ 10-21). Defendants argue that this constitutes a material default under the terms of the Roof Subcontract.

Plaintiff CIC asserts that its understanding of this issue is that Savarino was not entitled to any of the settlement proceeds unless and until it repaired the pinhole damage, something it never did.  Further, Plaintiff asserts that the roof continually failed from its installation in 2005 through Savarino's promise to replace it in 2008.  (Pl.'s Memo. in Opp. at 4).  Mr. Hennigan testified as to this issue:

> At this point in time, June of 2008 [when Colasanti terminated the Roof Subcontract], I didn't know what happened to the - - alls I know is Great American contributed or paid to Colasanti $333,500 on this pinhole issue.  Now, I remember in the very beginning of this claim Savarino's plan was – with the consent of Colasanti – was to hopefully get a settlement or funds from Great American, as the builder's risk carrier, to help pay for the defective fabric, such as the pinholes.  Now, whether that was in fact the agreement between the two, I wasn't made aware of it. . ..

(Hennigan Dep. at 118-119).

Finally, Plaintiff CIC argues that "even if Savarino is correct that Colasanti breached its Subcontract with Savarino with respect to the failure to pay the Builder's Risk insurance proceeds, Savarino continues to have a remedy against Colasanti."  (Pl.'s Memo. in Opp. at 14). Plaintiff references the Tender Agreement that was executed between CIC and Colasanti which specifically states: "the surety and obligee acknowledge that this Agreement in no way constitutes a waiver of any claims between the Principal and Obligee under the Subcontract or otherwise, all of which are reserved."  (Tender Agreement ¶ 9, attached as Ex. K to Pl.'s Memo. in Opp.). Plaintiff concludes that "Savarino was and remains free to continue to litigate any affirmative claims for wrongful termination or other damages against Colasanti, including any damages it allegedly suffered by virtue of Colasanti's alleged failure to pay insurance proceeds to Savarino." (Pl.'s Memo. in Opp. at 14).  The fact that Plaintiff is even acknowledging Defendants potential

-22-

claims against Colasanti, but have failed to assert that it actually investigated the matter, provides further support for Defendants' position that Plaintiff did not conduct a reasonable investigation of liability under the Performance Bond.

The Roof Subcontract does provide that Defendants should have received their just proceeds from the insurance settlement, however, there is no definitive time set regarding such payment. Therefore, if the proceeds were intended to be paid upon the repair of the pinhole damage, such contingency seems reasonable. At the time Defendants were terminated, there does not appear to be any breach by Colasanti, however, it is an issue that may have required further investigation by Plaintiff CIC. It appears from Mr. Hennigan's testimony that he was aware of the GAIC settlement, but he does not reference any further investigation by himself or anyone else employed by Plaintiff to determine what effect this claim would have on liability under the Performance Bond. While the issue of whether Defendants should have been paid some or all of the money from the GAIC is not before this Court, it does appear that it is an issue that Plaintiff CIC should have conducted a reasonable investigation of to see what, if any, effect it had on liability under the Performance Bond.

### 4. Insurance Policies

#### a. Project Professional Liability Insurance

The Design Build Agreement required Colasanti to procure a Project Professional Liability Insurance Policy to protect against errors and omissions by any design professional associated with the Project. Paragraph 12.4.5 specifically provides:

> PROJECT PROFESSIONAL LIABILITY INSURANCE: aggregate coverage of
> $3,000,000. This coverage shall include prior acts coverage sufficient to cover all
> professional services rendered to the Project by Contractor's design employees,

the architect and other design subconsultants.  The coverage shall be continued in effect for four years after the Date of Substantial Completion.

Donald Kosnik, Vice President and Chief Financial Officer of Colasanti testified that these provisions were incorporated into the Roof Subcontract between Colasanti and Savarino. (Kosnik Dep. at 48, 89-90).  Savarino then executed the Roof Subcontract in reliance on Colasanti's obligations to provide the required insurance policies for the duration of the Project. (*See* Savarino Aff. at ¶ 10).

However, Colasanti never obtained the Project Professional Liability Insurance Policy as required.  (McNish Dep. at 17; Kosnik Dep. at 90-103).  Mr. Kosnik testified that he did not recall Colasanti obtaining such a policy and that he was not able to locate a project professional liability policy.  Mr. Kosnik further stated that Mr. William McNish with the McNish agency has been the sole agent to provide insurance coverage for Colasanti for fifteen years and he would know if such a policy was ever obtained.  (Kosnik Dep. at 90-103).  Mr. McNish testified that no project professional liability insurance policy was obtained on behalf of Colasanti for this Project. (McNish Dep. at 17).  Defendants argue that it is undisputed that Colasanti did not procure the required policy and therefore breached the Roof Subcontract.  Defendants further argue that Colasanti's failure to procure the policy is a substantial breach of the Roof Subcontract that precedes all others, and that the Surety, CIC's duty under the Performance Bond was never triggered.

Mr. Hennigan, with CIC, acknowledged receipt of Savarino's  letter pointing out Colasanti's obligation to provide the insurance.  However, Mr. Hennigan testified that he did not

-24-

recall asking Colasanti about the coverage, nor did he ask Colasanti about its contractual obligation to provide such insurance coverage.  Further, Mr. Hennigan did not request any documents, specifically the Design/Build Agreement, to determine if such obligation existed. (Hennigan Dep. at 125-128).  Rather, Mr. Hennigan testified:

> In my experience, a general contractor doesn't have professional liability coverage. Professional liability coverage is – is reserved for just what it says, a professional person, such as an engineer or an architect. . . . In my experience, general contractors have no reason to have professional liability. . . if you're getting back to what it says in the contract [between Savarino and Colasanti] . . . there was no reason for us to ask for that.

(Hennigan Dep. at 140-142).  Mr. Hennigan even went so far as to say, "Now if Sam Savarino can get funds from Colasanti's professional liability carrier or whoever's professional liability carrier, great, go get it, write us a check."  (Hennigan Dep. at 113).

Plaintiff CIC argues that any such failure to obtain this insurance is irrelevant because this type of insurance policy would not have covered Savarino or its design consultants.  Specifically, Plaintiff asserts that the express wording of the provision indicates that it covers services rendered to the Project by "Contractors' design employees" and says nothing of any design employees hired by a subcontractor, such as Savarino.  Contractor refers to Colasanti.  Further, the policy would cover the "architect," which would be TMP Associates, Inc. and "other design subconsultants."  Plaintiff argues that the policy would not have provided insurance for Savarino's designers.  Additionally, Plaintiff argues that Savarino was required under the Roof Subcontract to obtain the same professional design liability insurance.

Defendants counter that Pontiac's clear intent was that all providers of design services to the Project be insured under one professional liability policy.  Further, Colasanti subcontracted

with Savarino to provide both design and construction services, thereby making Savarino both a design subconsultant and construction subcontractor.  Finally, Defendants argue that Article 4 of the Roof Subcontract, which addresses both what documents comprise the "Subcontract Documents" and which provisions in those documents constitute an obligation of Savarino, provides:

> Throughout the Contract Documents terms such as "Trade Contractor" or "Contractor" shall mean "Subcontractor" unless for those items apparent by content [or] usage that the "Contractor" reference is specific to the party having a Contract Agreement with the Construction Manager, Owners Contracting Representative or Owner."

Defendants therefore assert that both content and usage suggest that the reference to "Contractor" in Section 12.4.5 of the Design Build Agreement governing the obligation to provide Project Professional Liability Insurance is intended to apply only to Colasanti, and not Savarino.

There does not appear to be any dispute that Colasanti failed to obtain the Project Professional Liability Insurance Policy as required by paragraph 12.4.5 of the Design/Build Agreement.  However, as reflected by the extensive briefing of the parties on this issue, there is clearly a dispute as to whether such a policy would even apply to Savarino, and whether Savarino was also required to obtain such a policy.  Yet, the evidence reflects that Plaintiff CIC did not perform any investigation on this issue.  CIC did not even request a copy of the policy.  There is a possibility that had such insurance been obtained, it may have applied to at least part of the damages caused to the Project, thereby possibly alleviating some liability under the Performance Bond.  Accordingly, Plaintiff CIC should have conducted a reasonable investigation of this issue.

**b.      Builder's Risk Insurance**

-26-

Colasanti was also required to provide a project specific Builder's Risk Insurance policy for the Project in effect through final payment by Pontiac.  That obligation is set forth in Paragraph 12.8 of the Design Build Agreement which specifically provides:

> [Builder's Risk insurance shall be maintained] unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons or entities who are beneficiaries of such insurance, until final payment has been made as provided in Paragraph 8.2 or until no persons or entity other than TIFA has an insurable interest in the property required by this Paragraph 12.8 to be covered, whichever is earlier. This insurance shall include the interests of TIFA, the Contractor, Subcontractors, and Sub-subcontractors in the Project.

Colasanti did initially purchase a project specific builder's risk policy with GAIC with an effective policy period from November 1, 2003, through November 1, 2004.  Following the initial coverage period, Colasanti renewed the policy on a month to month basis only until June 4, 2005, at which time the policy lapsed.  At this time, Pontiac had not accepted the Project from Colasanti, nor made final payment as required in Paragraph 12.8 of the Design Build Agreement.

Mr. Hennigan agreed that Pontiac had not accepted the Project and that Savarino continued to work on the Project, however, he testified that Builder's Risk Insurance was "not applicable at this timeframe [January 2008]" and would only "cover something by specific perils, such as weather.  Weather is a big – big – one of the big perils that builder's risk would cover."  (Hennigan Dep. at 70, 93, 141-143).  Further, when asked about the January 2008 wind event that brought the tensile roof down, Mr. Hennigan admitted he was not aware of the event and claimed no knowledge of any investigation performed by anyone to determine the cause of the roof failure following this event.  (*Id*. at 96-97).  Defendants, therefore, argue that had Plaintiff performed a proper investigation of the claim, it would have been aware of this weather event, confirmed Colasanti's obligation to maintain builder's risk insurance through final payment, and

-27-

ultimately determined that Colasanti had permitted the builder's risk insurance coverage to lapse while Savarino continued to work on the Project.  (Defs.' Mot. at 18).

Plaintiff CIC argues that the termination of the builder's risk policy on June 4, 2005 is not relevant because the policy did not cover design defects.  Section B.3.c.(2) of the Builder's Risk Policy with GAIC specifically states that the insurer would not pay for any loss caused by "faulty, inadequate or defective : . . . (2) design, specifications, workmanship, repair and construction. . .." (See Builder's Risk Policy attached as Ex. J to Pl.'s Memo. in Opp.).  Plaintiff, therefore, states that even if the policy had been in place in 2008, it would not have covered a design defect, which was responsible for the damage to the roof, according to Mr. Michelek's June 11, 2008 letter wherein he asserts that "the specified design is flawed."  (Ex. G to Pl.'s Memo. in Opp.).

Plaintiff CIC also argues that Savarino was required to obtain a Builder's Risk Policy. Plaintiff asserts that Savarino cannot argue that Colasanti is in breach of the Roof Subcontract, when it was required to obtain the same insurance policy.  Finally, even to the extent Colasanti was required to maintain such insurance, there was no breach by Colasanti because the provision only requires insurance be maintained "until final payment" or until "no persons or entity other than TIFA has an insurable interest in the property. . .."  (Ex. 1 attached to Defs.' Mot.).

Defendants counter that Plaintiff conspicuously omits that Mr. Michelek also referenced weather as an alternative contributing cause of the damage to the roof.  Defendants assert that the faulty workmanship exclusion provides an ensuing loss exception: "if 'loss' by a Covered Cause of Loss results, we will pay for that resulting 'loss'."  (Builder's Risk Policy).  In accordance with this language, Defendants argue that "even if the design of the tensile roof was flawed and Savarino was found responsible for the design defect, the exclusion would still not apply because

-28-

of the ensuing loss exception." (Defs.' Reply at 12). The Sixth Circuit addressed this issue in *Blaine Construction Corp. v. Ins. Co. of North America*, 171 F.3d 343 (6th Cir. 1999). In *Blaine*, the insurer raised two exclusions from coverage, including faulty workmanship, when a construction contractor sought insurance coverage for replacing ceiling insulation ruined by water. The Sixth Circuit held that neither exclusion raised by the insurer applied and, in particular, that the exception for ensuing loss brought the loss for the insulation back into coverage. Further, the Court held that the ensuing loss did not have to arise from a separate and independent peril, but was covered even though it followed naturally from the excluded peril. *Id.* at 350-354. Therefore, there appears to be an issue of whether the damage to the fabric at issue in this case from unexpected weather conditions would constitute an "ensuing loss" covered by the Builder's Risk Policy. However, as Defendants correctly point out, Colasanti let the policy lapse, so Savarino does not even have the option to pursue this issue.

Defendants argue that Savarino had an insurable interest in the Project in January 2004, and when Colasanti allowed the policy to lapse, this constituted a breach, despite Plaintiff's assertions that "no person or entity other than Pontiac/TIFA had an insurable interest in the property." (Pl.'s Memo. in Opp. at 13). Defendants offer ample evidence that Pontiac had rejected Colasanti's tender of the tensile roof, and that Pontiac claimed it could not use the amphitheater for one of its intended purposes, hosting high school graduation ceremonies, because of the roof tears. Defendants reference the following caselaw in support of their argument: *Hartford Fire Insurance Company v. Riefolo Construction Co., Inc.*, 81 N.J. 514 (Sup. Ct. N.J. 1980) ("although the building might have been 'substantially complete' so as to permit recovery of the price on the construction contract, the use of the term to interpret the

phrase 'in the course of construction' in an insurance contract is inappropriate and misleading.");
*American and Foreign Ins. Co. v. Allied Plumbing & Heating Co.*, 36 Mich. App. 561, 565
(1971) (builder's risk coverage terminates when the building is fully constructed and "ready for
the use or occupancy for which it was intended."); and *Cuthrell v. Milwaukee Mechanics Ins.
Co.*, 234 N.C. 137 (1951). In *Cuthrell*, the appellate court denied the insurer's appeal and upheld
a jury verdict in favor of the insured since there was "ample evidence" that the building, which
was intended to be used as a restaurant and for recreational purposes, was not sufficiently
complete for these uses at the time of the fire, even though it had been put to a temporary use
before the loss. *Id.* at 141.

There is no dispute that the Builder's Risk Policy lapsed on June 4, 2005. However, again
as reflected by the extensive briefing of the parties on this issue and as discussed above, the
following issues remain in dispute: whether Colasanti was required to continue to renew the
policy or if the Project had been turned over to Pontiac; if Colasanti had renewed the policy,
whether it would even apply to the damage to the roof; and finally whether Savarino was also
required to obtain such a policy. Like the previous issues, the evidence is lacking as to whether
Plaintiff CIC performed any investigation regarding these issues. It appears Plaintiff was content
with determining the loss of the roof was the result of the faulty design. However, as illustrated
above, the inquiry does not end there. Like the Project Professional Liability Insurance Policy,
there is a possibility that had Colasanti renewed the Builder's Risk Policy, it may have applied to
at least part of the damages caused to the Project, thereby possibly alleviating some liability under
the Performance Bond. Accordingly, Plaintiff CIC should have conducted a reasonable
investigation of this issue.

-30-

         **c.**      **CIC's Defense that Savarino Failed to Raise Insurance Issues**

Plaintiff CIC argues that Savarino never asserted that it was relieved of performing because of the failure of Colasanti to purchase insurance coverage until the filing of Defendants' Motion for Summary Judgment.  Plaintiff questions "to the extent Savarino did not know of or assert the failure to procure a malpractice policy in response to the performance bond claims, how was CIC supposed to have known of or asserted such defense, even to the extend this was a valid defense?"  (Pl.'s Memo. in Opp. at 9).  Plaintiff states that "Savarino's position loses all credibility when viewed as nothing more than a last-ditch "Johnny Come Lately" assertion to avoid substantial judgment."  (Pl.'s Memo. in Opp. at 9).

Defendants respond to Plaintiff's question of how was it supposed to know, by stating "it should have asked for the policy!"  (Defs.' Reply at 9).  Defendants argue that it put Plaintiff on notice that Colasanti had an obligation to procure a Project Professional Liability Insurance Policy and that the collapse of the tensile roof might be a covered claim under the policy as early as May 23, 2008.  (*See* email correspondence attached as Ex. 5 to Defs.' Reply).  Further, in Michalek's June 11, 2008 letter, he stated:

> The Colasanti's Design/Build requires that Colasanti obtain Project Professional Liability Insurance with $3,000,000 in coverage to cover Colasanti's design employees, the architect and other design subconsultants.  Colasanti has repeatedly been asked to put the carrier on notice so that this loss is covered.  To date, no confirmation of the policy or the notice of loss has been received by Savarino.

(Ex. G to Pl.'s Memo. in Opp.).  Defendants assert that it believed in good faith that Colasanti had procured the policy and no reason to suspect otherwise.  Defendants describe that they were given the "proverbial runaround" by Colasanti regarding the insurance, but Plaintiff CIC "held all the cards" and could have asked Colasanti for the insurance policies.  (Defs.' Reply at 8-9).

In addition to the arguments raised by Defendants, Plaintiff CIC was put on notice of Colasanti's obligations to obtain the aforementioned insurance policies in the plain language of the Roof Subcontract.  At the very least, Plaintiff CIC should have reviewed the underlying contracts of the Indemnity Agreement to determine liability.  It seems reasonable that such review would have at least raised a question as to whether one or both insurance policies might cover at least some of the loss to the roof.  However, Plaintiff never took this next step and asked for the insurance policies.  The Court therefore finds that there is evidence that Plaintiff CIC did not conduct a reasonable investigation of the claim on the Performance Bond.

The Court does not believe it is necessary, nor proper, to make an actual finding of default by Colasanti of the Roof Subcontract. The Court has not been made aware of any underlying legal actions between Defendants Savarino and Colasanti.  Further, Colasanti is not a party to this action.  However, if such finding were made by another court, this Court could take judicial notice of such finding.  This is the scenario that was presented in *Seaboard Surety Co. v. Dale Construction Co., et al.*, 230 F.2d 625 (1st Cir. 1956).  In *Seaboard*, there was a finding by the Armed Services Board of Contract Appeals that Dale Construction was not in default of the Army Base contract.  The Court then concluded that "Seaboard was not entitled to recover because its payments to the contractor it employed to finish the job 'were voluntary payments as distinguished from payments for which there was liability.'" *Id.* at 630.  Defendants, relying on *Seaboard*, argue that Plaintiff CIC should be considered a volunteer because it paid Colasanti under the Performance bond despite Colasanti's prior default(s), and Plaintiff should not be able to cover its losses or expenses under the Indemnification Agreement.  Further, Defendant states that "[i]f an indemnitee breaches this duty by engaging in conduct that materially prejudices an

-32-

indemnitor or increases its risk, the indemnification obligation must be discharged as a matter of law." (Defs.'s Mot. for Summ. J. at 11 (citing *Dana Corp. v. Fireman's Fund Ins. Co*, 169 F. Supp. 2d 732 (N.D. Ohio 1999)).

Defendants assert that summary judgment in their favor is the appropriate remedy in this case. However, the *Seaboard* court ultimately held that the issue of whether surety "in good faith believed it was either desirable or necessary for it to take over the work in order to protect its interests as surety" had not been addressed by the district court and remanded for a hearing on that issue. Moreover, additional cases suggest that if Defendants have sufficiently raised questions as to whether a jury could find that Plaintiff failed to make a good faith investigation before paying the claim, a question of fact has been raised and the case is not appropriate for summary judgment. *See, e.g., General Insurance Co. of America v. K. Capolino Construction Corp., et al.*, 908 F. Supp. 197 (S.D.N.Y. 1995).

The Court acknowledges, as the *General Insurance* case did, that the Indemnity Agreement is designed to permit the surety to make good faith decision on claims without becoming involved in any legal wrangling between contractor and the owner. However, "granting such enforcement would require overlooking the equally specific terms of the performance bond." *General Insurance*, 908 F. Supp. at 200. This Court, therefore, "holds the surety to the terms of both of the agreements it negotiated." *Id.* Accordingly, this Court, like *General Insurance*, finds there are triable issues of fact regarding whether Colasanti was in default of the underlying Roof Subcontract and whether Plaintiff CIC acted in good faith and reasonably in paying Colasanti's demand on the Performance Bond.

**B.      Defendants' Option to Request Plaintiff to Defend Claims**

Plaintiff CIC argues that the Indemnity Agreement provided Defendants with a remedy in the event they desired that the claims on the bonds be litigated, rather than settled.  Specifically, the second paragraph of the Indemnity Agreement required the Defendants to:

> (i) give notice to the Surety to this effect; (ii) simultaneously deposit with the Surety cash or other collateral satisfactory to the Surety in an amount determined by the Surety to be sufficient to cover the claim or demand and interest thereon to the probable date of disposition plus attorneys' fees; (iii) or deposit simultaneously with the Surety cash or collateral satisfactory to the Surety; and (iv) take over the resistance and litigation of the claim or demand using competent counsel approved in advance by the Surety.

Accordingly, Plaintiff asserts that, to the extent Defendants wished CIC to litigate the claims, they were provided with that opportunity, but failed to do so.  Plaintiff relies on *Reliance Insurance Co. v. Dipietro Plumbing Corp.*, 1989 WL 32935 (N.D. Ill. Apr. 3, 1989), which rejected all of the indemnitors' defenses because they failed to exercise their right to require the surety to litigate the claims.  The *Reliance* court found that the indemnitors did not make a request in writing, nor did they deposit collateral with the surety, as required by the Indemnity Agreement.  Therefore, the court held that the surety had the right to settle the claims, in its sole discretion.  Plaintiff therefore requests this Court grant summary judgment in its favor because Defendants in this case had the option to deposit collateral and request that Plaintiff defend the claim on the Performance Bond, but failed to do so.  Plaintiff states that "the Indemnitors did not notify CIC that it desired that the claims be resisted and litigated nor did they provide collateral.  Accordingly, Defendants cannot now allege that Plaintiff should not have paid those claims."  (Pl.'s Mot. at 14).

Defendants argue that Plaintiff, in asserting this argument, is ignoring "its gatekeeper responsibility which is to determine, first and foremost, whether Surety's duty under the Performance Bond is even triggered."  (Defs.' Memo. in Opp. at 28).  Defendants further assert

-34-

that Plaintiff does not even reference the alleged breaches of the Roof Subcontract by Colasanti and how such allegations potentially effect liability under the Performance Bond.

Plaintiff does recognize Defendants allegations of bad faith, but assert such claims have no merit, relying on *International Fidelity Insurance Co. v. Vimas Painting Co.*, 2009 U.S. Dist. LEXIS 14962 (S.D. Ohio 2009) (Holschuh, J.). In *Vimas*, Defendants, indemnitors, argued they should be excused from payment of the demanded collateral security because Plaintiff acted in bad faith, but the *Vimas* Court disagreed holding that "the 'good faith' provision of the Indemnity Agreement is completely unrelated to Defendants' contractual duty to make the collateral security payment." *Id.* at *16.

Defendants, however, argue that *Vimas* collateral security provision differs from the provision in this case. In *Vimas*, the provision provided:

> Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by the Surety. (Indemn. Agr. P 2) (emphasis added).

*Id.* at *13-14. However, the Indemnity Agreement in the case at bar provides:

> If for any reason the Surety shall deem it necessary to set up or to increase a reserve to cover possible liability, loss, attorneys' fees and expenses *for which the Undersigned will be obligated to indemnity the Surety, under the terms of this Agreement*, the Undersigned will deposit with the Surety, immediately upon demand, a sum of money equal to such reserve and any increase thereof as collateral security to the Surety for such liability, loss, attorneys' fees and expenses. . ..

(Indemnity Agreement, ¶ 20). Defendants argue, and the Court agrees, that in order to determine what Defendants "will be obligated to indemnify," a determination must first be made regarding whether liability under the bond has been triggered. As discussed in detail in the prior section, the

indemnification provision requires that payment be "reasonable under all circumstances." Thus, unlike *Vimas*, the collateral security provision in this Indemnity Agreement is directly tied to the indemnification provision, and the reasonableness requirement. Thus, having found that there is a genuine issue of material fact regarding whether Plaintiff CIC acted reasonably in paying Colasanti's demand on the Performance Bond, it follows that whether Savarino was required to post collateral security is a triable issue.

### C. Contractual Collateral Security

The Indemnity Agreement provides that the Indemnitors are to provide CIC with collateral immediately upon CIC's demand, in an amount equal to CIC's reserve. Paragraph 20 specifically states:

> If for any reason the Surety shall deem it necessary to set up or to increase a reserve to cover possible liability, loss, attorneys' fees and expenses for which the Undersigned will be obligated to indemnity the Surety, under the terms of this Agreement, the Undersigned will deposit with the Surety, immediately upon demand, a sum of money equal to such reserve and any increase thereof as collateral security to the Surety for such liability, loss, attorneys' fees and expenses. . ..

Plaintiff CIC asserts that it made a formal demand for collateral upon Defendants on October 2, 1008, in the amount of $2,393,940.38, reflecting the then-current reserves. Plaintiff states that it has now made various payments from such reserves and currently has reserves in the amount of $162,082.57. Plaintiff again asserts that its right to collateral is not conditioned upon a showing that CIC will ultimately be forced to pay the claims, only that reserves were set to cover "possible liability, loss, attorneys' fees and expenses. . .". (Pl.'s Mot. at 17). There is no dispute that claims were asserted against CIC under the Performance Bond, that CIC made the collateral demand upon Defendants, and that Defendants have not paid any collateral to Plaintiff.

-36-

In addition to the arguments set forth above, Defendants argue that they have no obligation to provide CIC with collateral because the reserves set by CIC are unnecessary and excessive. The $2.3 million collateral security demand included a $1,955,189.40 reserve for the Colasanti claim. But, Defendants assert that they shared the May 2008 Architen Landrell proposal with Plaintiff that would have cost $1,297,530.00 to implement, over $650,000 less than the amount demanded by Plaintiff. Even if Plaintiff did not want to accept any cost estimate proffered by Defendants, Span Systems bid for the work was $1.6 million, still almost $400,000 less than the amount of Plaintiff's demand. Defendants further argue that the demand does not take into account the $557,147 contract balance that Colasanti has withheld from Savarino. In light of these cost figures, Defendants argue that Plaintiff's demand for collateral security was excessive. There does appear to be some question as to whether the amount demanded is excessive, however, the Court does not find it necessary to address this issue.

As discussed in detail above and acknowledged by Mr. Hennigan in his deposition, if an obligee under a performance bond is in material breach of its obligations under the contract, the surety's obligations under the bond are not triggered. Accordingly, there is no reason for the surety to demand that the principal under the bond post collateral security. Therefore, the question of whether Plaintiff performed a reasonable investigation of Colasanti's default following receipt of its claim in June 2008 remains in dispute, without a determination on that issue, the Court cannot determine whether Defendants were required to comply with Plaintiff's demand for collateral security. The case law relied upon Plaintiff involves simply indemnification cases, but again, this is not a simple case and those cases do not address the unusual circumstances encountered by the parties in this case. Therefore, at this time, Defendants' failure to pay the

collateral security does not entitled Plaintiff to judgment in its favor.

### C.    Plaintiff's Common Law Claims

Neither party has moved for summary judgment, nor referenced Plaintiff's common law claims for indemnification and quia timet.  These claims are essentially alternative claims to the contractual claims for indemnification and collateral security.

The Indemnification Agreement at issue in this case governs the parties obligations, therefore Plaintiff's common law claim for indemnification is not proper.  *See Fidelity & Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983) ("'[R]esort to implied indemnity principles is improper when an express indemnification contract exists.'") (quoting *Commercial Ins. Co. of Newark*, 558 F.2d at 953).

Further, quia timet is "the right of the surety to compel its principal to place the surety 'in funds' sufficient to prevent anticipated future losses, where a surety has reasonable grounds to believe that its principal will not perform his obligations."  *Abish v. Northwestern Nat. Ins. Co.*, 924 F.2d 448, 450-51 (2d Cir. 1991).  Plaintiff claim under the doctrine of quia timet is duplicative of its request for specific performance of the collateral security provision of the Indemnity Agreement.  Therefore, to the extent Plaintiff is entitled to collateral security, such determination shall be made under the Indemnity Agreement.  Accordingly, Plaintiff's claims for common law indemnification and quia timet are hereby dismissed as duplicative.

## IV.    CONCLUSION

Based on the foregoing, the Court **DENIES** Plaintiff CIC's Motion for Partial Summary Judgment and **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment.  As set forth above, Plaintiff's claims for common law indemnification and quia timet

are hereby dismissed.  Plaintiff's claims for indemnification and collateral security remain pending.


The Clerk shall remove Documents 70, 74 and 86 from the Court's pending motions list.

**IT IS SO ORDERED.**


*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**